# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| REPUBLIC TOBACCO L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 2738 |
| | ) | |
| NORTH ATLANTIC TRADING | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Republic Tobacco, L.P.'s ("Republic") partial motion for summary judgment on Counts I, II, and IV of the complaint and motion for summary judgment on all the counterclaims. This matter is also before the court on Defendants North Atlantic Trading Company, Inc.'s, North Atlantic Operating Company, Inc.'s, and National Tobacco Company, L.P.'s (collectively referred to as "North Atlantic") motion for summary judgment. For the reasons stated below, we deny Republic's partial motion for summary judgment and grant Republic's motion for summary judgment on the counterclaims. In addition, we grant North Atlantic's motion for summary judgment.

# BACKGROUND

Plaintiff Republic Tobacco, L.P. ("Republic") alleges that North Atlantic and Republic both import and sell roll-your-own tobacco papers and products. Both North Atlantic and Republic allegedly market their products through distributors and wholesalers that sell the products to retail stores. North Atlantic allegedly imports and distributes its papers under the ZIG-ZAG brand name and Republic allegedly imports and distributes its products under brand names such as the TOP and JOB brand names.

Republic further alleges that North Atlantic prepared and circulated to its buyers a "false and misleading presentation deck titled 'Cigarette Paper Review.'" (Compl. Par. 9). In the "Cigarette Paper Review" ("CPR"), North Atlantic allegedly criticized Republic for marketing "Look Alike Products" that Republic contends are similar to the ZIG-ZAG brand. (Compl. Par. 9). North Atlantic also allegedly criticized Republic in the Review for falsely saying Republic's product "is the same paper" as the ZIG-ZAG brand paper. (Compl. Par. 9). In the Review, North Atlantic also allegedly portrayed Republic's Chairman, Donald R. Levin ("Levin"), as a liar. According to Republic, North Atlantic contacted Republic's customers and informed the customers that Levin lied to the customers and that Levin lied under oath about the composition of Republic's cigarette papers. (Compl. Par. 8). Specifically, Republic alleges that North Atlantic's promotional materials falsely accuse Republic of making statements that directly contradict Levin's sworn

testimony in a previous lawsuit between North Atlantic and Republic. (Compl. Par. 12). Republic alleges that North Atlantic is making such allegations in order to "interfere with Republic's customer relationships by causing customers to be concerned about the nature and quality of Republic's products and the integrity and veracity of Republic's top executive." (Compl. Par. 13). Republic contends that the Review constitutes false advertising that was used by North Atlantic to undermine Republic's relationships with its customers and the perceived integrity of Republic's products. Republic alleges that North Atlantic's alleged misconduct has adversely impacted Republic's sales and damaged its business relationships and reputation in the cigarette paper industry.

North Atlantic contends that it is a licensee as part of a distribution and licensing agreement ("Licensing Agreement") with Bollere Technologies, S.A. ("Bollore") under which North Atlantic is the exclusive trademark licensee and distributor of ZIG-ZAG brand cigarette papers in the United States. North Atlantic contends that it distributes the ZIG-ZAG brand 1 ¼ size cigarette papers and other cigarette papers in the United States pursuant to the agreement. North Atlantic claims that it sells the cigarette papers in an orange packaging, which is referred to as "French orange." (CC Par. 12). North Atlantic further contends that it sells its product to retailers, including specialty stores, convenience stores, and grocery stores, and that those retailers sell the product to consumers for approximately $2.00 per package. North Atlantic contends that Republic sells JOB 1.25 and JOB 1 ¼

Orange cigarette papers, which are in direct competition with North Atlantic's product. Republic allegedly sells its product to similar retailers as North Atlantic, the competing products are located in close proximity in retail locations and sold to consumers, and the JOB 1.25 cigarette papers are sold to consumers for approximately $1.00 to $2.00. Finally, North Atlantic contends that Republic has increased Republic's marketing efforts to increase its market share.

Republic brought the instant action and included in the complaint a false advertising claim alleging a violation of 15 U.S.C. § 1125(a) of the Lanham Act ("Lanham Act Section 43(a)"), 15 U.S.C. § 1051 *et seq.* (Count I), a claim alleging a violation of 815 ILCS 510/2 of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/1 *et seq.* (Count II), a claim alleging a violation of 815 ILCS 515/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 515/1 *et seq.* (Count III), a defamation claim (Count IV), and a common law unfair competition claim in the form of a tortious interference with prospective economic advantage ("TIPEA") claim (Count V). On June 30, 2006, North Atlantic moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Fraud Act claim (Count III) and the unfair competition claim (Count V). On October 18, 2006, we denied the partial motion to dismiss. On September 18, 2006, North Atlantic filed a motion to join necessary parties pursuant to Federal Rule of Civil Procedure 19(a), which we subsequently denied. On October 27, 2006, North Atlantic filed counterclaims and included a false advertising claim

alleging a violation of Lanham Act Section 43(a) (Counterclaim I), a claim alleging

TIPEA (Counterclaim II), and a claim alleging a violation of 815 ILCS 510/2 of the

Fraud Act, 815 ILCS 515/1 *et seq.* (Counterclaim III).  Republic moves for

summary judgment on Counts I, II, and IV of the complaint.  Republic also moves

for summary judgment on all of North Atlantic's counterclaims.  North Atlantic

moves for summary judgment on all claims in the complaint.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most

favorable to the non-moving party, reveals that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  In seeking a grant of summary judgment the moving party must

identify "those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial

burden may be satisfied by presenting specific evidence on a particular issue or by

pointing out "an absence of evidence to support the non-moving party's case."  *Id*.

at 325.  Once the movant has met this burden, the non-moving party cannot simply

rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided

for in [Rule 56], must set forth specific facts showing that there is a genuine issue

for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). When there are cross motions for summary judgment, the court should "construe the evidence and [draw] all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

## DISCUSSION

I.  Lanham Act Section 43(a) Claim (Count I), IDTPA Claim (Count II),
and Fraud Act Claim (Count III)

Republic includes in its complaint false advertising claims based upon violations of Lanham Act Section 43(a) (Count I), an IDTPA claim (Count II), and a Fraud Act claim (Count III). The IDTPA was "designed to address conduct

involving either misleading trade identification or false and deceptive advertising."
*Menasha Corp, v. News America Marketing In-Store, Inc.*, 238 F.Supp.2d 1024, 1035 (N.D. Ill. 2003).  The Fraud Act prohibits "unfair methods of competition and unfair or deceptive acts or practices, including . . . the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission or such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Practices Act' . . . in the conduct of any trade or commerce. . . ."  815 ILCS 505/2.

Republic moves for summary judgment on the Lanham Act Section 43(a) claim (Count I) and the IDTPA claim (Count II) and North Atlantic moves for summary judgment on the Lanham Act Section 43(a) claim (Count I), the IDTPA claim (Count II), and the Fraud Act claim (Count III).  The IDTPA claim (Count II) and Fraud Act claim (Count III) are evaluated under the same analysis as the false advertising claim.  *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp.2d 1029, 1038 (N.D. Ill. 2001)(stating that unfair competition claims brought under Illinois law and IDTPA claims are reviewed under the same analysis that is employed for a Lanham Act claim); *D 56, Inc. v. Berry's Inc.*, 955 F.Supp. 908, 920 (N.D. Ill. 1997)(stating that "[u]nder Illinois law, claims under the [Fraud Act] and the IDTPA are to be resolved according to principles set forth under the Lanham Act").  Section 43(a) of the Lanham Act provides that:

any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  To establish a claim for false advertising under Lanham Act Section 43(a), Republic must prove:  "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products."  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999)(citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)).  If such a statement by a defendant is literally false, a plaintiff does not need to show actual deception or likelihood of deception.  *Id*. at 820.  If the statement is literally true or ambiguous, "a plaintiff must prove that the statement is misleading in context by demonstrate[ing] actual consumer confusion."  *Id*. at 820 (citing *B. Sanfield*, 168 F.3d at 971-72).  Actual confusion is shown by either direct evidence or survey evidence.  *Rust Environment*

*& Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1278 (7th Cir. 1997).  The plaintiff bears the burden of showing that the defendant's advertisement contains a false statement of fact.  *Hot Wax, Inc.*, 191 F.3d at 819 (stating that to establish claim under false or deceptive advertising prong of § 43(a) of Lanham Act, plaintiff must prove false statement of fact); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994)(stating that "a Lanham Act plaintiff bears the burden of proving literal falsity").  Thus, although during the summary judgment stage the defendant bears the burden of showing that the plaintiff cannot prove its claim as a matter of law, the plaintiff must show that it has sufficient evidence to put each issue into dispute.

A.  Falsity of Statements in CPR

Republic includes in the complaint allegations concerning statements within the CPR, which may be categorized into four areas:  (1) the CPR portrays Levin as a liar ("Levin Portrayal") ; (2) the CPR implies that JOB 1.25 and JOB 1 ¼ Orange cigarette papers are the same ("JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal"); (3) the CPR alleges that the JOB 1 ¼ Orange cigarette papers will confuse consumers ("JOB 1 ¼ Orange Confusion Portrayal"); and (4) the CPR falsely claims that North Atlantic's customers who refuse to sell JOB papers will make more money by excluding JOB papers from their product line ("Customer Financial Portrayal").  *See* (D SMF Par. 10); (P Resp. D SMF Par. 10).

The Levin Portrayal allegation includes a page entitled "Look Alike Product Situation," (D SMF Ex. A), which includes the following bullet points:

- The similarities in packaging suggests consumer confusion will occur
  - ☐ Is this how you want to treat your consumers?
- Competitor is saying it is the same paper . . . it is not
  - ☐ Don Levin (Owner – Republic Tobacco) testimony

("Look Alike Products Situation Slide"). (D SMF Ex. A). In addition, this allegation includes statements from the page entitled "The Facts: Mr. Don Levin Federal Court Testimony – 06/30/2003," (D SMF Ex. A), which reads:

Q. (Attorney) Tell me about building the Job brand in America from the time you took over until currently; in other words, from the early 70's till now. How did you go about building up the Job brand?
A. (Mr. Levin) Well, first we had to make the Job brand what people wanted. Why it was so exciting for me to get a brand that was different and I could control was because I could make it the right way. All the brands up until then and still most of them are, are made for European type of cigarettes. And again, like beer or European beer and American beer, you know, the difference in the taste. Cigarette papers and tobacco are the same. The Drum uses more of the European paper, more like (like) the ZIG-ZAG paper because it gives you that taste. So the first thing we did is change the composition of Job paper to be different from that of its competitors.

Q. (Attorney) And how did you make it different?
A. (Mr. Levin) Well, we – if you took a Camel or Lucky Strike, which is what we tried to make, it has a certain kind of paper. And that has wood and hemp and flax are the combinations. So we made our paper the same as that. So when you rolled a Top tobacco with the Job cigarette paper, it would taste like a Lucky or a Camel, if you will.
If you took that same tobacco and rolled it with this Job, this particular paper, which is that one we used for European tobacco – it's packaged like – the

same color is used – then you get the flavor like you get with a <u>ZIG-ZAG,</u> <u>which is a more European Flavor.  It's different.  Not bad.  It's different.</u>

("Levin Testimony Slide").  (D SMF Ex. A)(emphasis in original).

The statements in the CPR regarding the JOB 1.25 and JOB 1 ¼ Orange Portrayal includes the page entitled "The Facts: Look Alike Product Similarities," (D SMF Ex. A), in which pictures of packaging for JOB 1.25, ZIG-ZAG French Orange 1 ¼, and JOB 1 ¼ Orange are shown.  In addition to the depictions of the packages, the page contains captions over the JOB products stating "JOB 1.25 (Original)" and " JOB 1 ¼ [Orange] (Look Alike)."  (D SMF Ex. A).  Finally, the JOB 1.25 and JOB 1 ¼ Orange Portrayal page includes the statement, "Competitor recognizes the superior brand equity of ZIG-ZAG by coming out with a Job look alike."  (D SMF Ex. A).

The JOB 1 ¼ Orange Confusion Portrayal allegation includes the pictures and representations of the JOB 1.25 and JOB 1 ¼ Orange Portrayal, as well as the statements contained in the Levin Portrayal, including the phrase, "[t]he similarities in packaging suggests consumer confusion will occur."  (D SMF Ex. A).

Finally, the Customer Financial Portrayal allegation includes statements on pages throughout the CPR that represent financial data, market share, market category rank, manufacturer revenue, industry volume, and brand recognition and rankings.  These statements are depicted in bar graphs, linear graphs, pie charts, raw data, tables, numerical rankings, and area graphs and charts.

1.  Levin Portrayal

Republic argues, through combined arguments throughout its briefs, that the
Levin Portrayal in the CPR is literally false because:  (1) "JOB 1 ¼ Orange did not
even come into existence until 2005, two years after Levin testified," (2) "[i]t was
literally impossible for Levin to be comparing the yet-to-be-developed JOB 1 ¼
product with ZIG-ZAG," and (3) "Graham Purdy [("Purdy")], [North Atlantic's]
Vice President of Sales and drafter of the CPR, admitted he knew that Levin's
testimony did not refer to JOB 1 ¼ Orange."  (P Mot. SJ 9).  North Atlantic
contends that the Levin Portrayal in the CPR is not literally false and that Republic
is unable to show that the statements are misleading because no actual consumer
confusion can be demonstrated.

Republic contends that the Levin Portrayal in the CPR is false because JOB 1
¼ Orange was not in production until 2005, which was two years after Levin
testified in federal court, and that Levin therefore could not have been comparing
JOB Orange 1 ¼ cigarette papers to ZIG-ZAG cigarette papers.  However, the fact
that North Atlantic cites the Levin testimony to support its proposition that different
companies have different cigarette paper is, at most, misleading or ambiguous.
Although Levin was not specifically testifying before the federal court as to JOB 1
¼ Orange, Levin was testifying generally about the JOB brand that he acquired as
evidenced by Levin's statement that "first thing [he] did [wa]s change the
composition of JOB paper to be different from that of its competitors."  (D SMF Ex.

A). In addition, nowhere in the Levin Portrayal does North Atlantic mention that the testimony dealt with JOB 1 ¼ Orange cigarette paper. North Atlantic's citation to Levin's testimony simply goes toward the fact that cigarette paper between manufacturers differs.

Republic also argues that the Levin Portrayal in the CPR is false because Purdy knew that Levin's testimony did not refer to JOB 1 ¼ Orange cigarette paper. However, the undisputed evidence shows Republic misconstrues the full force of Purdy's testimony. Specifically, Purdy testified that Levin's testimony "wasn't JOB specific," referred to "JOB paper packings," and "was the JOB line and anything associated with the JOB line of papers . . . [which represented] anything prior to or anything after that quote." (D Rep. Ex. B 69). Thus, as noted above, Republic's contention that Levin's testimony does not refer to JOB 1 ¼ Orange cigarette paper is incorrect since the CPR does not state that Levin is testifying about the JOB 1 ¼ Orange cigarette paper and the Levin Portrayal is used in the CPR to refer to JOB generally. Therefore, since Republic has failed to offer any proof that the Levin Portrayal is literally false, Republic must demonstrate actual consumer confusion. *Hot Wax, Inc.*, 191 F.3d at 820.


## 2. JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal

Republic argues that the JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal in the CPR is literally false because "the products are different, sold in different

packages, and subject to different promotions." (P Resp. D Mot. SJ 4). However, no statement in the CPR states that JOB 1.25 and JOB 1 ¼ Orange are the same product. Rather, the CPR contains pictures that represent that Republic released a brand of cigarette paper, JOB 1.25, which was not in the orange packaging and then Republic subsequently released a different brand of cigarette paper, JOB 1 ¼ Orange, in order to have a product to compete in the cigarette paper with orange packaging market. Such a depiction is not a literal falsity and Republic admits that such a statement is not literally false in its motion for summary judgment when it argues that North Atlantic "incorrectly suggests," (P Mot. SJ 10), in the CPR that the JOB 1.25 cigarette paper is the same as JOB 1 ¼ Orange. Since the statement is an implication, rather than a literally false statement, Republic "must prove that the statement [in the CPR] is misleading in context by demonstrate[ing] actual consumer confusion." *Hot Wax*, 191 F.3d at 820.

### 3. JOB 1 ¼ Orange Confusion Portrayal

Republic argues that the JOB 1 ¼ Orange Confusion Portrayal in the CPR is literally false because: (1) "JOB 1 ¼ Orange is plainly not a ZIG-ZAG product" and (2) the product designation as "'JOB' is [placed] in eight separate places on the package and on each leaf of the paper contained in the package." (P Mot. SJ 6). North Atlantic contends that the JOB 1 ¼ Orange Confusion Portrayal in the CPR is an opinion, rather than literally false, and that Republic is unable to prove that the

statements are misleading because no actual consumer confusion can be demonstrated.

The CPR does not contain statements that give the legal conclusion that consumer confusion has occurred, which may be a literally false statement as Republic contends. Rather, the CPR contains statements of opinion suggesting that consumers may be confused by similar packaging for cigarette papers. In connection with the subsequent page, the CPR, as stated above, conveys that Republic released a brand of cigarette paper, JOB 1.25, that was not in the orange packaging and then Republic subsequently released a different brand of cigarette paper, JOB 1 ¼ Orange, in order to have a product to compete in the orange cigarette paper packaging market. In addition the statement that "[t]he similarities in packaging suggests consumer confusion will occur" is, at most, misleading or ambiguous. (D SMF Ex. A).

Republic argues that North Atlantic must prove that the statements in the CPR are true, and that Republic need not show that the statements in the CPR are literally false. However, this contention misstates the burden placed upon Republic. Republic bears the burden of showing that North Atlantic's advertisement contains a false statement of fact, and Republic has failed to do so. *See Hot Wax, Inc.*, 191 F.3d at 819 (stating that to establish claim under false or deceptive advertising prong of § 43(a) of Lanham Act, plaintiff must prove false statement of fact); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994)(stating that "a

Lanham Act plaintiff bears the burden of proving literal falsity").  In addition, Republic has failed to meet its burden and the undisputed evidence shows that no actual confusion has occurred between cigarette paper with orange packaging as evidenced by customer inquiries about the potential of the instant action being brought due to the "new JOB Orange and its resemblance to the ZIG-ZAG Orange." (D Ex. 31).  Thus, the CPR does not contain a false statement as Republic contends, but instead contains a statement of opinion concerning confusion that will, and has, taken place among competitors that sell cigarette paper in orange packaging.

### 4.  Customer Financial Portrayal

Republic argues that the Customer Financial Portrayal in the CPR is literally false because: (1) North Atlantic falsely advertises that it has a 46.4% share of the convenience store market and (2) North Atlantic "told customers that they would lose no sales by selling ZIG-ZAG Orange [cigarette] papers at twice the price of JOB Orange."  (P Resp. D Mot. SJ 4).  North Atlantic contends that the statements regarding market share cannot be literally false since the data is accurate.

Republic argues that North Atlantic falsely represents its strength in the cigarette paper market because North Atlantic's "own expert contradicts the 46.4% figure, [when the expert states that North Atlantic] had 41% in the beginning of 2005 [and] 37% by September 2006."  (P Mot. SJ 12).  Republic argues that the statements are literally false based on North Atlantic's market share in *units* rather

than North Atlantic's market share in *dollars*. The data represented in the CPR is not literally false since the representations in the CPR include North Atlantic's share of the cigarette paper market in *dollars* rather than *units*. The evidence that Republic cites misstates the undisputed evidence as the expert was referring to North Atlantic's position in the market as to units rather than its market position in terms of dollars. In addition, the statements in the CPR include table headings such as "% Share of Category $." (D SMF Ex. A). Finally, North Atlantic's financial data was from a market study concerning the percentage of market share that shows that North Atlantic held a market share in terms of dollars of 46.4%. (D SMF Ex. A)(stating that data was received from AC Neilson & Co. report dated 1/28/2006); (D Resp. P SMF Par. 42). Although the data representation may not be evident at a glance, such is not the test for determining literal falsity and, at most, would render the statements confusing or ambiguous.

As we stated earlier, Republic bears the burden of showing that the Customer Financial Portrayal contains a false statement of fact. *See Hot Wax, Inc.*, 191 F.3d at 819 (stating that to establish claim under false or deceptive advertising prong of § 43(a) of Lanham Act, plaintiff must prove false statement of fact); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994)(stating that "a Lanham Act plaintiff bears the burden of proving literal falsity"). Republic has failed to meet its burden and the undisputed evidence shows that the data represented in the

CPR with regard to North Atlantic's market share based on revenue is not literally false.

### B.  Consumer Confusion & Injury to Republic

Republic argues that consumer confusion exists because it is able to point to four customers that after reviewing the CPR did not sign exclusive contracts with Republic.  (P Mot. SJ 13).  However, Republic admits that these customers were in the process of negotiating exclusive contracts and the uncontroverted evidence shows that one of the customers that Republic refers to, Tesoro, became a Republic customer in a separate capacity.  (D Resp. P SMF Par. 49).  In addition, Republic has failed to point to any evidence that substantiates that customers failed to sign exclusive contracts due to statements within the CPR rather than from legitimate competition.  Republic has also failed to show that any sales were diverted to North Atlantic from Republic due to the statements contained within the CPR.  Instead, Republic has merely pointed to customers that were already a part of the North Atlantic distribution chain and that Republic was hoping to supply with its products.  (D Ex. WW); (D Resp. P SMF Par. 45, 49, 50).  Finally, the undisputed evidence shows that valid reasons existed for each of the potential customers to forego signing an exclusive contract with Republic, including the fact that the customers were longtime customers of North Atlantic, that Republic was a new entrant in the market, and that the potential customers were satisfied with the current cigarette

paper product that they purchased.  (D Ex. WW); (D Resp. P SMF Par. 45, 49, 50).

*See Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir.

1999)(noting that "competition, which though painful, fierce, frequently ruthless,

sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful

economic system" and that "[c]ompetition is not a tort").  Therefore, Republic has

not adduced any evidence of actual consumer deception resulting from the CPR nor

has Republic shown that it was "injured as a result of [any] false statement, either by

direct diversion of sales from itself to [North Atlantic] or by loss of goodwill

associated with its products."  *Hot Wax, Inc.*, 191 F.3d at 819.  Based on the

foregoing analysis, no reasonable jury could find that the CPR contained statements

that were literally false, that statements in the CPR created consumer confusion, or

that Republic suffered injury as a result of the statements in the CPR.  Therefore, we

grant North Atlantic's motion for summary judgment as to the Lanham Act Section

43(a) claim (Count I), the IDTPA claim (Count II), and the Fraud Act claim (Count

III).


II.  Defamation Claim (Count IV)

Republic contends that the undisputed facts establish that North Atlantic

"made false statements about Republic in the CPR" that constitute defamation *per

se*.  (P Mot. SJ 8).  Under Illinois law, a statement is considered defamatory if it

"tends to cause such harm to the reputation of another that it lowers that person in

the eyes of the community or deters third persons from associating with him."

*Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992). To establish a

claim of defamation under Illinois law, a plaintiff must establish that: (1) "the

defendant made a false statement concerning the plaintiff," (2) "there was an

unprivileged publication of the defamatory statement to a third party by defendant,"

and (3) "the plaintiff was damaged." *Dubinsky v. United Airlines Master Executive*

*Council*, 708 N.E.2d 441, 446-67 (Ill. App. Ct. 1999). An Illinois defamation action

can either state a claim for defamation *per se*, which involves statements so harmful

to one's reputation that damages are presumed, or for defamation *per quod*, which

involves statements requiring extrinsic facts to show their defamatory meaning.

*Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996).

In a defamation *per se* action, a plaintiff must prove that the defendant made

statements or imputations that Illinois considers actionable *per se*, which include (1)

commission of a criminal offense, (2) infection with a venereal disease, (3)

"inability to perform or want of integrity in the discharge of duties of" public office,

(4) "fornication or adultery," and (5) words that prejudice a party in "her trade,

profession, or business." *Id.* at 1214-15. If the statement is considered defamatory

*per se*, it is considered to be so harmful to the plaintiff that damages are presumed

and need not be proven. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d

717, 726 (7th Cir. 2004). In addition, under Illinois law, a statement is not

defamatory if it is "reasonably capable of an innocent construction." *Republic*

*Tobacco Co.*, 381 F.3d at 726 (citing *Kolegas*, 607 N.E.2d at 206).  Under the innocent construction rule, "'[a] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*.'"  *Muzikowski v. Paramount Pictures Corp.*, 2007 WL 416983, at *5 (7th Cir. 2007)(quoting *Tuite v. Corbitt*, 2006 WL 3742112 (Ill. 2006)).  In assessing the meaning of statements alleged to be defamatory, "'statements reasonably capable of an innocent construction should be interpreted as nondefamatory,'" but "'the innocent construction rule does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable.'"  *Id.* (quoting *Tuite*, 2006 WL 3742112).  Whether a statement is subject to an innocent construction is for a court to decide.  *Kolegas*, 607 N.E.2d at 207.  Republic and North Atlantic both move for summary judgment on Republic's defamation claim (Count IV).

A.  Levin Portrayal

Republic contends that the Levin Portrayal constitutes defamation *per se* since North Atlantic states in the CPR that Levin is "a liar" since "Republic claims JOB 1 ¼ Orange is the same paper as ZIG-ZAG" and then "unfairly and inaccurately claimed that [Levin] testified in the earlier defamation lawsuit that

ZIG-ZAG and JOB 1 ¼ Orange were different." (P Mot. SJ 9). However, nowhere in the CPR does North Atlantic refer to Levin as a liar or that he perjured himself before the federal court. In addition, the CPR does not contain statements that would tend to suggest that Levin lied or perjured himself in federal court. Rather, taking the facts in the light most favorable to Republic, the statements in the CPR express that competitors in the heavily populated cigarette paper with orange packaging market are claiming that all cigarette paper in the orange packaging is equal. The undisputed evidence shows the Levin Portrayal was presented in a way so as to show that although cigarette paper may have similar packaging, the cigarette paper contained in the packaging is different, as stated by one of North Atlantic's competitors, Republic. This statement is thus subject to the innocent construction that ZIG-ZAG cigarette papers are different from those of the competitors, even if the competitors' product has similar packaging. Any other reading of the statements, which includes testimony stating as such, would be wholly illogical since North Atlantic's sole purpose in this portion of the CPR was to point out the differences between its product and those of competitors. *See Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839-40 (Ill. 2006)(stating that "a court must consider the statement in context and give natural and obvious meaning to its words and the implications arising from them"). Therefore, we grant North Atlantic's motion for summary judgment on Republic's defamation *per se* claim (Count IV) as it relates to the Levin Portrayal.

<u>B.  JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal</u>

Republic argues that the JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal constitutes defamation *per se* since "the CPR incorrectly suggests that Republic simply repackaged the JOB 1.25 product as JOB 1 ¼ Orange and sold it alongside the 'original' Job 1.25 [cigarette] papers" by "comparing a picture of JOB 1.25 (calling it the 'original') to a picture of JOB 1 ¼ (calling it the 'look alike')."  (P Mot. SJ 10).  Taking the facts in the light most favorable to Republic, the CPR states that Republic created a new orange packaging for a cigarette paper product, JOB 1 ¼ Orange, in order to compete with the orange packaging of the ZIG-ZAG brand cigarette paper.  This statement is one which conveys the popularity of the ZIG-ZAG brand in the orange packaging and the competitors' procedures in order to compete in the cigarette paper with orange packaging market.  Given that the facts show that the CPR was presented to potential customers that discussed the benefits of the ZIG-ZAG brand, the statement is subject to the innocent construction that North Atlantic's competitors are continually introducing new products and packaging in order to compete with North Atlantic's orange packaging.  The CPR merely shows that Republic released a brand of cigarette paper, JOB 1.25, that was not in the orange packaging and then released a different brand of cigarette paper, JOB 1 ¼ Orange, in order to have a product in the market of cigarette paper with orange packaging.  Finally, Republic's contention that North Atlantic "incorrectly suggests," (P Mot. SJ 10), in the CPR that the JOB 1.25 cigarette paper is the same

as JOB 1 ¼ Orange is not actionable as defamation since such a supposition cannot be the basis for such a claim.  *See Wilkow v. Forbes*, 241 F.3d 552, 555 (7th Cir. 2001)(stating that "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.")(quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).  Therefore, based on the analysis above, no reasonable jury could find other than that the JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal is not actionable as defamation since the statement is subject to the innocent construction rule and is simply explaining that other companies are entering this particular market.  Therefore, we grant North Atlantic's motion for summary judgment on Republic's defamation *per se* claim (Count IV) as it relates to the JOB 1.25 and JOB 1 ¼ Orange Similarity Portrayal.

C.  JOB 1 ¼ Orange Confusion Portrayal

Republic argues that North Atlantic's contention that JOB 1 ½ Orange cigarette paper may cause consumer confusion with ZIG-ZAG cigarette paper in the orange package constitutes defamation *per se*.  Taking the facts in the light most favorable to Republic, the statement in the CPR that "[t]he similarities in packaging suggests consumer confusion will occur" is an opinion that the JOB 1 ¼ Orange cigarette paper and ZIG-ZAG cigarette paper in the orange packaging look similar. (D SMF Ex. A).  This statement is potentially forward-looking as to what may

happen when consumers are faced with the decision to purchase a brand of cigarette paper in orange packaging and was presented in the CPR in order to show potential customers the benefits of purchasing the ZIG-ZAG brand. The undisputed facts show that many cigarette paper manufacturers sell a product in orange packaging and such a statement is subject to the innocent construction whether consumers may be confused due to the color of the packaging as to which product to purchase. The statement is also an opinion that the two packages look similar in color and is therefore not actionable as defamation since a prediction of future events can neither be true nor false. *See Wilkow*, 241 F.3d at 555 (stating that "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.")(quoting *Haynes*, 8 F.3d at 1227). Whether an allegedly defamatory statement is an opinion is a question of law. *Moriarty v. Greene*, 732 N.E.2d 730, 740 (Ill. App. Ct. 2000)(citing *Owen v. Carr*, 497 N.E.2d 1145, 1148 (Ill. 1986)). Therefore, no reasonable jury could find other than that the JOB 1 ¼ Orange Confusion Portrayal was merely an opinion. Therefore, we grant North Atlantic's motion for summary judgment on Republic's defamation *per se* claim (Count IV) as it relates to the JOB 1 ¼ Orange Confusion Portrayal.

D.  Customer Financial Portrayal

Republic also argues that statements in the CPR constitute defamation *per se* because the statements incorrectly inform "customers that Republic has a smaller market share than it actually has and that customers will lose money selling Republics [cigarette] papers."  (P Mot. SJ 12).  Republic claims that North Atlantic "inflate[ed] its own market share" by representing that in 2005 North Atlantic "held 46.4% of the convenience store market," that this data was obtained from "a small sampling of data purchased by AC Nielsen," and that North Atlantic actually had a market share of 37% according to one of North Atlantic's expert witnesses. However, the uncontroverted evidence shows otherwise.

Republic's argument concerning market share is based upon the notion that statements in the CPR are directed toward North Atlantic's market share in *units* rather than North Atlantic's market share in *dollars*.  The statements in the CPR are clear in that they indicate that North Atlantic is representing its share of the cigarette paper market in dollars rather than units.  The evidence that Republic cites for its contention that North Atlantic's "own expert contradicts the 46.4% figure, [when the expert states that North Atlantic] had 41% in the beginning of 2005 [and] 37% by September 2006," (P Mot. SJ 12), misconstrues the undisputed evidence as the expert was referring to North Atlantic's position in the market as to units rather than its position as to dollars.  In addition, the statements in the CPR demonstrates that North Atlantic based its share of the cigarette paper market on dollars rather than

units, evidenced by the headings that state "% Share of Category $".  (D SMF Ex.
A).  Finally, the statements of which Republic refers were taken directly from a
market study concerning the percentage of market share that shows that North
Atlantic indeed held a market share of 46.4%.  (D SMF Ex. A)(stating that data was
received from AC Neilson & Co. report on 1/28/2006); (D Resp. P SMF Par. 42).
Simply because North Atlantic chose to represent its market share position in a way
that Republic disapproves of is neither false nor actionable as a defamation claim.
Therefore, we grant North Atlantic's motion for summary judgment on Republic's
defamation *per se* claim (Count IV) as it relates to the Customer Financial Portrayal.

Based on the foregoing analysis, no reasonable jury could find that statements
in the CPR constituted defamation *per se*.  Therefore, we grant North Atlantic's
motion for summary judgment on Republic's defamation *per se* claim (Count IV) in
its entirety.


III.  TIPEA Claim (Count V)

Republic also alleges an Illinois unfair competition claim against North
Atlantic in the form of a TIPEA claim.  *See American Broadcasting Co. v. Maljack
Prods., Inc.*, 34 F. Supp. 2d 665, 681 (N.D. Ill. 1998)(noting that "the principal form
of the tort of unfair competition 'falls under the rubric of tortious interference with
prospective economic advantage'")(quoting *Zenith Electronics Corp. v. Exzec, Inc.*,
1997 WL 223067, at *6 (N.D. Ill. 1997)).  Under Illinois law, in order to prevail on

a TIPEA claim, a plaintiff must show: "'(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Evans v. City of Chicago*, 434 F.3d 916, 929 (7th Cir. 2006)(quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296 (Ill. 1996)). In addition, as both parties know from previous litigation between them on this legal issue, in order to survive summary judgment, a plaintiff must identify a specific third party with whom the plaintiff would have done business but for the interference of the defendant. *See Associated Underwriters of Am. Agency, Inc. v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005)(stating that "[a] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed toward that third party"); *see, e.g., Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 254 F. Supp 2d. 1007, 1012 (N.D. Ill. 2003)(granting summary judgment on tortious interference claim where the plaintiff "fail[ed] to provide evidence of any specific customers who terminated or altered their relationship with [the plaintiff] as a result of any conduct" by the defendant)(emphasis in original); *Celex Group, Inc. v. The Executive Gallery, Inc.*, 877 F. Supp. 1114, 1125 (N.D. Ill. 1995)(granting summary judgment where the plaintiff did not even "attempt[] to identify any specific third parties with whom it had a reasonable business expectancy" but rather relied on "past and present

corporate executive customers" as an "identifiable class" and finding that during the summary judgment stage that a plaintiff "must come forward with its evidence and identify particular third parties with whom it had a reasonable expectancy of entering into business").  North Atlantic moves for summary judgment on Republic's TIPEA claim.

North Atlantic argues that "Republic has failed to identify any legitimate expectancy that was not fulfilled."  (D Mot. SJ 14).  In Republic's response to North Atlantic's motion for summary judgment, Republic identifies "four chains . . . that Republic had a reasonable expectation of entering into business relationships with. . . ."  (P Resp. D Mot. SJ 14).  Specifically, Republic identifies GasAmerica, Valero Energy, Tesoro, and Speedway SuperAmerica as the potential customers.  North Atlantic, in its reply to Republic's contention of lost customers, contends that Republic's identification is inconsistent with Republic's "verified answers to crystal-clear interrogatories [that state Republic] could identify no lost customers and no lost sales" and that Republic should be foreclosed from introducing this evidence after discovery has closed.  (D Resp. D Mot. SJ 14).

In Republic's response to North Atlantic's interrogatories, Republic does not identify any of these four potential customers.  *See* (P Resp. Inter. 4, 6); (SMF Par. 10, Ex. E).  Federal Rule of Civil Procedure 26(e) ("Rule 26(e)") states that a party has a duty to amend a prior response when "he knows that the response though correct when made is no longer true and the circumstances are such that a failure to

amend the response is in substance a knowing concealment." Fed. R. Civ. P. 26(e)(2)(B). In addition, Rule 26(e) states that determining the existence of the duty to amend a previous answer is within the sound discretion of the district court. *See, e.g., Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir. 1979)(stating that duty to amend is a discretionary decision to be made by the district court). Republic had a duty to supplement its previous answers to North Atlantic's interrogatories and Republic was required to turn over information relating to these potential customers. Specifically, Republic should have supplemented its previous answer with the material now contained in its Local Rule 56.1 statement of undisputed material facts in Paragraphs 45, 48, and 49, and in its Local Rule 56.1 statement of additional undisputed material facts in Paragraph 4. Republic's duty to supplement its previous answers arose when it made the strategic decision to use these potential customers and supporting documentation regarding these customers in the instant motion for summary judgment. Therefore, Republic cannot now assert that it had a valid business expectancy with the companies that it now names after claiming otherwise throughout discovery. Therefore, such evidence will not be considered at this stage. Thus, Republic has provided no evidence that it had a reasonable expectancy of entering into a valid business relationship and we grant North Atlantic's motion for summary judgment as to Republic's TIPEA claim (Count V).

Even if Republic was able to introduce such evidence, Republic's contentions that it is able to point to customers that it had an expectancy of entering into a business relationship with is unsupported by the record. For example, Republic admits that it was in the process of negotiating exclusive contracts with such customers. (P Resp. D Mot. SJ 14). However, the record does not support an interpretation other than that Republic was merely in the negotiating stage with hopes of convincing these customers that Republic was the better option for their business. This is insufficient to prove that Republic had any viable business relationship with the companies it names in support of its allegations. *See Hoopla Sports & Entertainment v. Nike*, Inc., 947 F. Supp. 347, 358 (ND. Ill. 1996)(stating that "'[t]he hope of receiving an offer is not a reasonable expectancy'")(quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)). Further, Republic admits that the contracts that customers chose to forego were exclusive contracts with Republic in which the customers would only sell Republic products, rather than products of its competitors. However, Republic was not foreclosed from seeking other relationships with these customers in which the customers would sell Republic's product side-by-side with its competitors. In fact, the uncontroverted evidence shows that one of the customers that Republic refers to, Tesoro, became a Republic customer in a separate, nonexclusive capacity. (D Resp. P SMF Par. 49). Simply because a potential customer was contemplating and eventually chose not to sign Republic's contract is not enough to show a specific customer or customers

who would have purchased products from Republic but for North Atlantic's actions. To allow a party's claim to survive summary judgment based on this evidence alone would allow liability "virtually without limit." *Celex Group*, 877 F. Supp. at 1125. The fact that a potential customer did not choose to select Republic as its sole supplier of cigarette papers is not evidence that Republic lost a valid business relationship. In addition, Republic has also failed to provide any evidence of damages from losing any potential customers. *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003)(stating that "summary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'")(quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Republic offers no additional evidence from which it may be inferred that Republic suffered any damage from North Atlantic's actions. Finally, as we stated earlier, there has been no wrongful conduct by North Atlantic with regard to the CPR that would preclude North Atlantic from engaging in valid competition with Republic as to any customers. *See Speakers of Sport, Inc.*, 178 F.3d at 865 (noting that "competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system" and that "[c]ompetition is not a tort"); *see also American Broadcasting Co.*, 34 F. Supp. 2d at 674 (N.D. Ill. 1998)(defining "wrongful" to include "fraud, deceit, intimidation, or deliberate disparagement"). Therefore, based on the above, no reasonable jury

could find that Republic had a reasonable expectancy of entering into a valid business relationship or that Republic was damaged by North Atlantic's actions. Therefore, we grant North Atlantic's motion for summary judgment on the TIPEA claim (Count V).

IV.  Lanham Act Section 43(a) Counterclaim (Counterclaim I) and

Fraud Act Counterclaim (Counterclaim III)

Republic moves for summary judgment on North Atlantic's Lanham Act Section 43(a) counterclaim and Fraud Act counterclaim for the reason that under the express terms of the Licensing Agreement, North Atlantic is precluded from bringing the instant action.  As we stated above, the Fraud Act counterclaim (Counterclaim III) is evaluated under the same analysis as the false advertising claims.  *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp.2d 1029, 1038 (N.D. Ill. 2001)(stating that unfair competition claims brought under Illinois law and IDTPA claims are reviewed under the same analysis that is employed for a Lanham Act claim); *D 56, Inc. v. Berry's Inc.*, 955 F.Supp. 908, 920 (N.D. Ill. 1997)(stating that "[u]nder Illinois law, claims under the ICFDBPA and the IDTPA are to be resolved according to principles set forth under the Lanham Act").

North Atlantic argues that both the Lanham Act and the Licensing Agreement expressly confer "standing" on North Atlantic.  (D Resp. P CC Mot. SJ 10).  Section 43(a) of the Lanham Act creates a cause of action for "any person who believes that

33

he or she is likely to be damaged" by a defendant's false designations of origin and

misleading representations of fact that are likely to cause confusion as to origin or

sponsorship. 15 U.S.C. § 1125(a). In the instant action, the Licensing Agreement

reads, in relevant part:

1. Distribution Rights
    (a) On the terms and subject to the conditions of this Agreement,
    Bollore hereby grants to the Distributor for the term of this Agreement
    (as defined in Section 6) the exclusive right to purchase the cigarette
    paper booklets sold under the trademark "ZIG-ZAG" . . . from Bollore
    for resale in the fifty United States and the District of Columbia and its
    territories, possessions and foreign military bases (the "Territory").
    During the term of this Agreement, Bollore shall not sell the Products
    to any person or company in the Territory. . . .

    (b) . . . During the term of this Agreement, the Distributor shall not sell
    the Products outside the Territory (other than pursuant to, and in
    accordance with the terms of, a written agreement with Bollore) and
    shall not knowingly sell the Products to any party who, directly or
    indirectly, resells or distributes such Products outside, or sells to a third
    party for resale or distribution outside, the Territory. . . . Bollore may
    select (a) other distributors for the Products in other territories, and (b)
    other distributors for any products not using the Marks (as defined in
    Section 9) in the Territory. . . .

    (c) The relationship between the parties is that of vendor and
    purchaser. . . .

    (d) The Distributor shall provide Bollore with information relating to
    unit sales volume and inventory of the Products in the Territory on at
    least a monthly basis. . . .

4. Advertising and Promotion
    (a) The Distributor shall submit to Bollore all written materials to be
    used in advertising, promotional and marketing campaigns (all of

which shall be prepared in accordance with Section 9), for approval by Bollore, which approval shall not be unreasonably withheld. . . .

9. Trademark License

(a) License. Subject to the terms and conditions hereinafter se forth, Bollore hereby grants the Distributor and exclusive, royalty-free license to use the marks "ZIG-ZAG" and the head design . . . (the "Marks") in the Territory in connection with the promotion of the Products for the term of the Agreement.  In the event that the Distributor is permitted to use third party manufacturers for the Products or manufacture the Products itself . . . then such license shall automatically be deemed granted, as an exclusive, royalty-free license to use the Marks in the Territory to manufacture or permit others to manufacture the Products for the Distributor's account as provided in such sections. . . .

(b) Ownership and Use of Marks.  Bollore hereby acknowledges that, as between the parties, the Distributore has acquired from USTC the U.S. registrations and pending application . . . for the mark "ZIG-ZAG" in the United States . . . and that the Distributor is the sole owner of the Tobacco Marks for use in the United States in connection with Tobacco Products and the goodwill pertaining thereto. . . .

The Distributor hereby acknowledges that, as between the parties, Bollore is the sole owner of the Marks and all variations thereof, for all uses (other than in connection with the Tobacco Products) and the goodwill pertaining thereto. . . .  If at any time the Distributor wishes to alter the Marks in any way or create new marks which are variations of the Marks or are used in conjunction with the Marks, such alterations and new marks . . . must be approved by Bollore prior to their use.

(f) Infringements.  Each of Bollore and the Distributor shall promptly notify the other, in writing, of any uses of the Marks in contravention of the license under this Agreement or which otherwise may infringe on the Marks which may come to such party's attention.  Bollore shall have to option to send cease and desist letters, commence and prosecute, at its own expense, such claims or suits, and take such other action, as it in its sole discretion deems necessary and the Distributor

agrees to cooperate fully with Bollore in the prosecution of any such claim. The Distributor shall have the option to commence and prosecute, at its own expense, any such claim or suit (or take other enforcement action) which Bollore determines not to commence or diligently pursue and Bollore agrees to cooperate fully with the Distributor in the prosecution of any such claim. All monetary recovery from any such claims or suits prosecuted shall be shared equally between the parties, after reimbursement of the costs of the prosecution.

(P SMF Ex. 7). North Atlantic claims that, based on the Licensing Agreement, the entry of summary judgment based upon a determination that North Atlantic may not bring the instant action as the licensee would be inappropriate.

North Atlantic claims that the Licensing Agreement "expressly confers upon North Atlantic the right to prosecute any claim or suit that Bollore decides not to commence or diligently pursue for whatever reason." (D Resp. P CC Mot. SJ 10). We agree, however, that such facts do not give rise to North Atlantic's right to bring the instant claims. Although the Licensing Agreement refers to North Atlantic as an exclusive licensee at times, the Licensing Agreement also sets forth many duties and rights between the parties that are inconsistent with an assignment of the ZIG-ZAG trademarks, such as geographic limitations on North Atlantic's territory, split awards for any monetary recovery, and limitations on the amount of control North Atlantic has over the ZIG-ZAG trademark. In addition, even if North Atlantic met the statutory requirement of being a "person who believes that he or she is likely to be damaged," 15 U.S.C. § 1125(a), by a likelihood of confusion, the express terms of the license prohibited it from bringing suit in its own capacity. Under the express

terms of the Licensing Agreement, if North Atlantic was aware of an infringement on the ZIG-ZAG trademarks, it was under a duty to notify Bollore. Once notice is given to Bollore, pursuant to Paragraph 9(f) of the Licensing Agreement, Bollore could, and was required to, bring the infringement lawsuit. Only when Bollore does not bring the infringement action on its own is North Atlantic able to file its own action.

North Atlantic contends that "Bollore is fully aware of North Atlantic's suit and claims against Republic here and has made no attempt to stop them." (D Resp. P CC Mot. SJ 10). However, North Atlantic provides no supporting documentation, nor does it provide any citation to the record to support its claim. North Atlantic has had ample time to develop the facts and present evidence of these contentions but it has failed to do so. Thus, pursuant to Local Rule 56.1, North Atlantic admits that no admissible evidence exists to contradict the assertion that Bollore did not give North Atlantic consent to bring the instant counterclaims against Republic. Local Rule 56.1; *Dent v. Bestfoods*, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003); *see also Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920, 922 (7th Cir. 1994)(stating that a court is not "obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions"); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)(stating "that a district court is entitled to expect strict compliance with Rule 56.1" and that "[s]ubstantial

compliance is not strict compliance").  Since the Licensing Agreement is the only source that gives North Atlantic any interest in the ZIG-ZAG mark, the Licensing Agreement's refusal to give North Atlantic the right to sue under these circumstances strips North Atlantic of the right to raise a Lanham Act Section 43(a) claim.  Based on the foregoing analysis, no reasonable jury could find other than that, pursuant to the Licensing Agreement, North Atlantic is precluded from bringing the instant counterclaims.  Therefore, we grant Republic's motion for summary judgment on the Lanham Act Section 43(a) counterclaim (Counterclaim I) and Fraud Act counterclaim (Counterclaim III).


## V.  TIPEA Counterclaim (Counterclaim II)

As stated above, pursuant to Illinois law, in order to prevail on a TIPEA claim, a plaintiff must show:  "'(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'"  *Evans*, 434 F.3d at 929 (quoting *Anderson*, 667 N.E.2d 1296).  Republic contends that North Atlantic is unable to show that North Atlantic had a reasonable expectancy of entering into a valid business relationship.

North Atlantic argues that "the record is chock full of admissions from which a reasonable jury could infer that current or prospective customers altered their behavior as a result of Republic's conduct." (D Resp. P CC Mot. SJ 9). In order to survive the summary judgment stage on a TIPEA claim, a plaintiff must identify a specific third party with whom the plaintiff would have done business but for the interference of the defendant. *See Associated Underwriters of Am. Agency, Inc.*, 826 N.E.2d at 1169 (stating that "[a] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed toward that third party"). North Atlantic makes numerous contentions regarding Republic's desire to "eliminate the ZIG-ZAG threat" and "completely dominate the market." (CC Resp. P Mot. SJ 9). North Atlantic further contends that "Republic has documented that it is killing North Atlantic's business by eliminating ZIG-ZAG paper from retail stores, pushing ZIG-ZAG papers out of the market, and effectively rendering [ZIG-ZAG] obsolete." (D Resp. P CC Mot. SJ 9). However, based on previous legal actions between North Atlantic and Republic, North Atlantic should be aware that such accusations are hardly enough to support the instant TIPEA claim. North Atlantic has simply stated that Republic has sought to gain market share in the cigarette paper market. *See, e.g., Republic Tobacco, L.P.*, 254 F. Supp 2d. at 1012 (granting summary judgment on tortious interference claim where the plaintiff "fail[ed] to provide evidence of any specific customers who terminated or altered their relationship with [the plaintiff] as a result of any

conduct" by the defendant)(emphasis in original).  North Atlantic's blanket statements and lack of any specific expectation of entering into a valid business relationship is not sufficient to withstand summary judgment.  Thus, as explained above, North Atlantic admits that it had no reasonable expectancy of entering into a valid business relationship with any potential consumers.  Local Rule 56.1; *Dent*, 2003 WL 22025008, at *1 n.1; *see also Waldridge*, 24 F.3d at 920, 922 (stating that a court is not "obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions"); *Ammons*, 368 F.3d at 817(stating "that a district court is entitled to expect strict compliance with Rule 56.1" and that "[s]ubstantial compliance is not strict compliance").  Based on the foregoing analysis, no reasonable jury could find that North Atlantic had a reasonable expectancy of entering into a valid business relationship with any specific customers.  Therefore, we grant Republic's motion for summary judgment on the TIPEA counterclaim (Counterclaim II).

## CONCLUSION

Based on the foregoing analysis, we deny Republic's partial motion for summary judgment on Counts I, II, and IV of the complaint and grant Republic's motion for summary judgment on all of the counterclaims. In addition, we grant North Atlantic's motion for summary judgment on all claims in the complaint.


_____
Samuel Der-Yeghiayan
United States District Court Judge


Dated: May 10, 2007